# PLEASANT VS. THE STATE.

An order for a change of venue, is sufficient, when it substantially conforms to the requirements of the statute.

Upon a change of venue, the original indictment remains in the court where it is preferred, and a transcript of it sent to the court to which the cause is removed.

The allegation, in an indictment against a negro for an assault, with intent to commit a rape, upon a white woman, is material, and must be proved; and the woman herself is competent to testify as to that fact.

The prosecutrix, in a trial for an assault, to commit rape, cannot be interrogated as to her criminal connection with any other person, or be compelled to answer questions that tend to criminate and disgrace her; nor can her chastity be impeached by evidence of particular acts of unchastity, though it may be, by general evidence of her reputation, in that respect.

A witness may testify as to the appearance of the prosecutrix, immediately after a rape has been committed upon her, or attempted, on his examination in chief, or, on his recall, as rebutting testimony: but not as to the particular facts she may have related to him, except to confirm her testimony after her credit has been impeached.

It is the province of the judge, at the trial, to confine the examination of witnesses to matters relevant to the issue, and to exercise a sound discretion in excluding irrelevant and foreign matter: and where a question does not, in its terms, manifest a relevancy to the issue, its object should be stated.

A witness is privileged from answering questions that would disclose his connection with another and distinct offence from the one on the trial of which he is called to testify.

Though a State's witness, in a criminal prosecution, break the rule and converse with other witness, this would not be absolute cause to exclude him from testifying—his conduct would go to his credit.

The rule in *Clark adx. vs. Moss et al.*, 6 *Eng. Rep.* 741, as to what constitutes a leading question, approved.

The practice has prevailed in this State, and will not be disturbed, of impeaching the character of a witness for truth and veracity, by permitting the witness to give his own opinion as to the credibility of the person impeached, founded on general reputation, after showing that he has the requisite knowledge of such reputation.

On a trial for rape, or an assault, with intent to commit a rape, evidence may be given that the prosecutrix is a "lewd woman, a strumpet, or prostitute," if founded upon her general reputation; but not upon the personal knowledge of the witness.

Where the court arrested the further examination of a witness, this court will presume that it exercised a sound discretion, in the absence of any showing that some further material fact was proposed to be proved by him.

The master is a competent witness for his slave in a case affecting his life, (*Austin vs. State*, 14 *Ark.* 555); and where such owner is excluded from testifying, and the grounds of his exclusion are not stated, this court may presume, in a case involving the life of a human being, that the judge supposed him to be incompetent by reason of his interest.

The object of instructions by the court, is to settle the law upon controverted points; and none need be given as to facts that are proven, and about which there could be no controversy.

Where instructions have been given, sufficient to guide the jury in coming to a conclusion as to the credibility of a witness, and the weight to be attached to his testimony, the court may decline to give others in relation to the same points.

*Appeal from the Circuit Court of Ouachita County.*

Hon. Thomas Hubbard, Circuit Judge.

S. H. Hempstead and Quillin, for the appellant.    The defendant had the right to ask the prosecutrix and witnesses as to particular acts of lewdness on her part, and was not confined in the examination to her general character as to want of chastity and virtue, or truth and veracity ; and had the right to ask the prose cutrix as to her connection with other men ; and also to ask of, and prove by, other witnesses, particular instances of such connection.    *The People vs. Abbott*, 19 *Wend.* 192.

Even though the witness may not be compelled to answer questions affecting his character, the defendant had the right to ask them, and the court clearly erred in not permitting the questions to be asked, and notifying the witness of his privilege, who might have answered or claimed his privilege.    1 *Phill Ev.* 279, 7 *Ed.;* 1 *Mood. & Walk.* 192; *ib.* 48, *note 3;* 6 *Cowen* 264.

The evidence of the particulars of the statements, made by the prosecutrix after the alleged assault, were hearsay, and inadmissible.    *The People vs. McGee*, 1 *Denio* 19.

79ᴮᴮ

The prosecutrix may be proved to be, *in fact*, a common prostitute, and not merely by general reputation. 1 *East* 444, 445; *Roscoe on Crim. Ev.* 708; *Rex vs. Barker*, 3 *Carr. & Payne* 589.

The court erred in refusing to permit, on the objection of the State, the owner of the prisoner to be sworn as a witness. *Austin vs. The State*, 14 *Ark.* 555. The objection to the witness, does not appear upon the record, but he is described as the *owner*, and this court will presume that the objection was because of his *interest*, or that the attorney of the State would have specified the objection.

The court erred in not permitting the question put to Landers, to be answered; in arresting the further examination of the witness Burnes; in refusing to give the fifth and sixth instructions asked by the prisoner; in giving the three instructions asked by the State.

Mr. Attorney General CLENDENIN, for the State. The defendant's counsel offered the owner of the slave as a witness, but the record does not show what the witness was expected to prove, or whether he would or could prove any thing. In ordinary cases, this court will presume in favor of the ruling of the court below, and that, unless the record shows the contrary, that the Circuit Court decided correctly.

In a common law action, a security in a bond for costs, or attachment bond, could not testify for his principal. Suppose, on the trial, the security was offered as a witness and ruled out, and the bill of exceptions only stated that he was offered and excluded, this court would presume that the Circuit Court decided correctly. The owner is a competent witness for or against his slave; but it does not appear that he was excluded on that point alone.

Mr. Chief Justice ENGLISH, delivered the opinion of the Court.

*Pleasant*, the slave of James Milton, was indicted, in the Union Circuit Court, for an assault with intent to commit rape upon

Sophia Fulmer, a white woman. He was tried, convicted, appealed to this court, and the judgment was reversed. See *Pleasant vs. The State*, 13 *Ark. Rep.* 361.

The cause having been remanded, it was twice continued on the motion of the accused, and afterwards, at the June term, 1854, he applied for a change of venue, upon which application the court made the following order:

"Came the State, &c., and the defendant is brought to the bar of the court in custody, &c., and files his petition for change of venue herein, upon his own application, duly sworn to by said petitioner, and the affidavit of James Milton, a creditable person, to the truth of the allegations therein, stating for cause of removal, as appears from said petition, that the minds of the inhabitants of said county of Union are so prejudiced against him (the appellant,) that he cannot have a fair and impartial trial; all of which appears to the satisfaction of the court. It is, therefore, considered and adjudged by the court, that the trial of this cause be removed to the county of Ouachita, in this State. It is further ordered, by the court, that said defendant be remanded to the jail of the county of Union, in the custody of the sheriff, &c.; and that, without any unnecessary delay, the said sheriff from thence take the body of the said defendant, and him convey to the jail of said county of Ouachita, and there deliver him to the keeper of said jail, together with the order by virtue of which the said defendant is imprisoned and held: and it is further ordered, that this cause be certified accordingly."

A duly authenticated transcript of the record and proceedings in the cause, including the order of removal, the petition therefor, &c., &c., appears to have been transmitted to the Ouachita Circuit Court, where the case came on to be tried at the September term, 1854.

The counsel of the prisoner moved the court to dismiss and strike the cause from the docket, for want of jurisdiction, on the grounds, that the order for the change of venue, was not made in compliance with the statute, and was not sufficient to divest the

jurisdiction of the Union Circuit Court, and vest it in the Oua-
chita Circuit Court.

I. The court overruled the motion, and the defendant's counsel
excepted.

The defendant was tried by a jury, convicted, motion for a new
trial, and in arrest of judgment, overruled, and bill of exceptions
setting out the facts.

On the trial, *Sophia Fulmer* introduced, as a witness,˙ on the
part of the State, testified, in substance, that she was the Sophia
Fulmer mentioned in the indictment—she knew the defendant,
his name was Pleasant—he was a negro man, and belonged to
James Milton.　He came to her˙house, in the fall of 1851, laid
down the yard fence, rode into the yard, hitched his horse to a
bush, and come into the house where she was ironing or starch-
ing clothes.　There was a jug under the table, and a bottle set-
ting on the table; and he said, "you seem to have liquor here;"
and took up the bottle, and before she had time to speak, took a
drink; and gathered hold of her breast, and asked her to give him
a chew of tobacco, and as she handed him the tobacco, he caught
her by the arm, and took hold of her breast again, and *stove* her
down on the floor, several times, and *stove* her on the bed, and
tried to smother her with her clothes, where her baby was lying,
and threw her on the baby, and satisfied himself on her clothes
and knees and legs—she did not know that she was thrown on
the baby, but it kept screaming—and, so soon as he was done,
he jumped up and ran as fast as he could ; and the first time she
saw him, after he got off of the bed, was as he jumped off the
gallery, fixing his pantaloons, and going towards his horse.　She
then got the gun, and when she got to the door with it, he was
just going out of sight, on his horse.　She then threw down the
gun on the bed, took up the child, and ran toward the mill, where
her brother and Mr. Landers were.　They were the closest per-
sons to the house she knew of.　She told them what had happened
at the house, and Mr. Landers went with her to the house.　She
was bruised on her breast and arm, and her *breast* was torn down

before. The negro caught hold of her breast, and threw her on the floor. She tried to scream and halloo as loud as she could, but he tried to smother her with her clothes. He took her dress and all her other clothes, and pulled them up over her head. This was done in the county of Union, State of Arkansas. Pleasant was a *negro*, and she a *white woman*.

II. (To the proof, by Mrs. Fulmer, that she was a white woman, the defendant objected, the court overruled the objection, and he excepted.)

The negro, Pleasant, had been to the mill, and came back by the house of witness, but turned out of the direct road, and came to the house.

*Cross - examined*—Defendant had never been to her house before, as she recollected, but had passed by, and asked for peaches, and gone to the orchard and got them. When she got to the door with the gun, defendant was going out of sight, around the horse lot, not more than fifty yards from the house, on his horse. The mill is a half mile from the house, and the house is twenty yards from the road he ought to have gone, in going home, or not quite so much, very close by. The first part of the day was wet, was not cold, but cool weather. It is called six miles from the negro's house to the mill. He came to the mill early in the morning. She could not state the hour of the day when the assault on her occurred. It was not cold enough to have a fire. The fire had died down after she got breakfast, and she did not mend it up any more. There was a little fire in the fire place, not much. It was not more than eight or nine o'clock, when the defendant came there to the mill. She did not see him as he went, though she was at home all the morning.

She agreed to take from James Milton, the owner of defendant, as a compensation not to prosecute the suit, $125, if he would run the boy off, and that she was scared into it by her brother, James Fogle, and Mr. Landers, and another man whose name she did not know. There were present, at the time, her brother, Landers, her husband, Jacob Fulmer, James Milton, John C. Willingham

and Richard Goode, and the stranger, whose name she did not know. The money to be obtained on the compromise, was not to be divided between her and Landers, and she knew of no understanding by which any debt her husband owed Landers was to be paid out of the money to be obtained from Milton. Did not know whether she said or not, at the time the compromise was being talked about, that the reason why she would compromise, she knew she was under a bad character, and did not want to go to court. They stated to her that they would prove certain things on her, and blacken her character. This, they said at the time they were persuading her to compromise; and they told her the law would not hurt her for compromising. She did not swear on the former trial of this cause that she got the gun first, and he (the negro) left afterwards, but that he left, and was on the gallery in a run, when she got the gun.

III. The defendant's counsel proposed to ask the witness, Mrs. Fulmer, the following questions, to the asking of which, the attorney for the State objected, the court sustained the objection, and defendant excepted.

"1. Have you, or not, had several difficulties with your husband, and has he not treated you badly?

"2. Have you not had difficulties with your husband about other men, he accusing you of illicit intercourse with them?

"3. Did you not insist that James Tiffin should stay all night with you, when your husband was not at home, in January or February, 1851; and did you not say, when he said the night was cold, and he must sleep with a woman, and if he staid there he might have a difficulty with your husband, not then at home, no, there would be no fuss about it, and that you liked to hug up a man, and tangle legs with him of a cold night; and did you not tell, at the same time, a Mr. E. H. Goodwin that he might go over to a house not far off, and that he might get to sleep with a girl there, that night, or some such conversation?

"4. Did not Jackson Burns solicit criminal connection with

you, some short time before the commencement of this suit, and did you not reply that you were not in a proper condition?

"5. Did not you try to take out a warrant against Jesse B. Bailey, for an attempt to commit a rape upon you in the year 1849 or 1850?

"6. Did you not tell, during those years, divers persons that said Bailey attempted to rape you?

"7. Did, or did you not, invite a negro woman slave, belonging to one of the neighbors, in the year 1851, in the presence of James Tiffin, to sit down at your table to dinner, and she did so, and you sat down and waited on her?

"8. Did you or not, in 1850, or 1851, have criminal connection with one William Landers, while you resided at the place where you resided, when you state defendant attempted to commit a rape upon you?

"9. Have you never had criminal connection with one James Smith, a witness in this cause?

"10. Have you not had criminal connection with other person or persons, than your husband since you were married; and not long before the commencement of this prosecution?

"11. Do you not know your husband was pretty largely in debt to Mr. Landers, at that time, and had no means to pay with?

"12. Were you not in the habit, about the year of the commencement of this prosecution, of riding about in the neighborhood of nights, behind Landers to see and sit up with the sick, and leave your husband at home, and when he would go on similar visits, you and Landers would stay at home?

"13. Did not Landers, at several times, or at one time in particular, in the presence of James Smith, lay his head in your lap, and you would comb it, since you were married, and shortly before the commencement of this suit?"

*Wm. Landers*, a witness on the part of the State, testified, in substance, that the defendant was a negro slave, and belonged to James Milton, that Sophia Fulmer was a white woman. Witness saw defendant in the fall of 1851, at the mill; he came there,

got his meal, and started back. In about half an hour, Mrs. Fulmer came to the mill, and said "that defendant came to the house and took hold of her, and had a considerable scuffle, and threw her on the bed, and smothered her with her clothes, and that she tried to halloo."

IV. (Defendant objected to the introduction of Mrs. Fulmer's declarations to witness, as hearsay, and moved to exclude them, but the court overruled the objection, and defendant excepted.)

Witness went to the house, loaded a pistol, and told her she must defend herself, for he could not stay there to defend her. The bed-clothes were all taken off the bed but one sheet, and were lying at the foot of the bed on the floor, and his gun was lying across the foot of the bed. He had left his gun sitting in the corner of the house. Jacob Fulmer, the husband of Sophia Fulmer, had gone to Eldorado. The mill is about half mile from the house, and the nearest neighbor lives about a mile off. He first saw defendant, on that day, at the house. It was witness' house, and Fulmer was living with him at that time. Defendant called for his meal, and he told him to go on to the mill, and as soon as he got breakfast, he would be down there. There was a young man there, and witness thinks he went down to the mill with him, and that left Mrs. Fulmer alone at the house. It was a cool drizzly day, raining a little, but not much. All this occurred in Union county.

*Cross-examined*—Did not recollect how long he had known Mr. and Mrs. Fulmer, nor how long they lived in the house with him. Did not believe they lived with him two years. They had no family but one child, and witness had none then. He became acquainted with them at Clawson's; was informed that Fulmer was out of business, and witness applied to them to go and live with him. They staid with him as much as twelve months. Witness did not use any means to intimidate, influence or induce Mrs. Fulmer, to a compromise with Milton, in reference to this prosecution. Believes that defendant hallooed at the fence, about twenty steps from the house, as he went on to the

mill. Thinks he (witness) was in the house eating breakfast; and he, James Fogle, and Mrs. Fulmer were in the house at the time; there was no other woman on the place; Mrs. Fulmer got the breakfast, and waited on the table.

*Questions by defendant*—"1. Was Fulmer very poor, and wholly unable to pay any thing, and was he not indebted to you about the time of the commencement of this prosecution?

"2. And was it not understood, and agreed, between you and Mr. and Mrs. Fulmer, that the money, to be obtained from Milton, on a compromise, should be applied in part to the payment of your debt, or some such agreement or understanding, between you and them?

"3. Was there not some consultation between you and Mr. and Mrs. Fulmer, in reference to a compromise with Milton about the time of the commencement of this prosecution?

"4. Did you and Mr. Fulmer, or you alone, not send for Milton, to come down to your house, for the purpose of trying to effect a compromise?

"5. Did you not try to get Milton to pay two hundred dollars, or some other amount, to prevent this prosecution?"

V. To the asking of which questions, the State's attorney objected, the court sustained the objection, and defendant excepted.

VI. It appears that, at the time Wm. Landers was offered by the State, as a witness, the defendant objected to his testifying, on the grounds that he was seen, a short time prior thereto, while under the rule, and in a room with his head out of a window, conversing with Jacob Fulmer, another witness for the State, who had staid the previous night with his wife, Sophia Fulmer, after she had testified, and he and she had been discharged from the rule, under the injunction of the court not to confer directly or indirectly with any other witness yet to be examined and under the rule. But the court permitted the witness to state what conversation occurred between him and Fulmer, at the time referred to, and to purge himself of contempt; and then permitted him to testify in the cause; and defendant excepted.

80BB

Here the State closed her testimony in chief.

*Jno. C. Willingham,* witness for defendant, testified, in substance, that Fulmer and wife lived with Landers, in the year 1851. On Monday after the offence was charged to have been committed, witness, hearing that Milton's negro man had been taken up by Fulmer, went to Fulmer's, to see about the matter. He was not requested to go by Milton, but Milton knew he was going, and remarked to him that he had better not go. When he got there, he saw Mrs. and Mr. Fulmer, Landers, Mrs. Fulmer's brother, and two strangers, one of whom he learned was a relation of Landers. The charge against defendant was talked about. Mr. Fulmer kept saying he would not have had it happen for $200. After he had made this remark several times, witness asked him if $200 would satisfy him to drop it. He said he did not know, but would go in and see his wife, who had lain down, and if she was satisfied to drop it, he was. Fulmer went and talked to his wife, and she stated to him that Mr. Landers would compromise it. Witness then talked with Landers about it, and his first proposition was about half the worth of the negro. Witness told him he could make no proposition himself, but could tell Milton. Landers said, tell Milton to come up soon in the morning; and witness told Milton on his way home.

Milton and witness went to Fulmer's, next morning. Did not hear the first of the conversation between the parties; but heard Milton tell Landers and Mrs. Fulmer, "he would not give it." Mr. Fulmer seemed to have very little to do about it. There were two or three propositions made by Landers and Mrs. Fulmer to compromise, each time agreeing to take less, Milton declining to accept them. The last proposition made by them, was to take $125, which was agreed to by Milton; and $75 thereof was to be paid to Mrs. Fulmer, either in money, or in the store; and the balance was to be paid to Landers. Mr. Fulmer was present, but witness did not think he said anything at that time. Landers and Mrs. Fulmer called on witness to stand for Milton, and he agreed to do so: the parties seemed to be satisfied. There

were no other terms in the compromise than that Milton should pay the $125. Did not know that any means were used by any one there to procure the assent of Mrs. Fulmer. She said to Landers, that any thing he would do, she would be satisfied with, and that she had told him so at the first. Witness was near by Mrs. Fulmer and Landers, when the compromise was being talked about, and heard no threats, or other means used to induce her to assent to the compromise, by Landers, or any one else. Did not know where the defendant was, when the compromise was made. Witness, Milton, and Landers, started to Eldorado, and Mr. and Mrs. Fulmer were to stay out of the way, and not to appear against the defendant at all. The object of Landers' trip to Eldorado was to stop the prosecution, but, after he got there, he ascertained he could not do it. The parties remained in Eldorado until evening, then went on home by Landers', and met the deputy sheriff on the way, who had been after Mr. and Mrs. Fulmer, but was returning without them, and Landers, in speaking of their keeping out of the way, said he had them where the sheriff could not find them. The Saturday previous to witness going to Fulmer's, was a wet day in the forenoon, showers falling enough to wet any one, disagreeable and cold. It is something like five miles from Milton's to the mill.

*Cross-examined*—When witness first went to Fulmer's, he saw the parties named in his examination in chief, and either Landers or Fulmer came out, did not recollect which. There was but one room in the house. The conversation commenced soon after he got there, by Mrs. Fulmer, talking about the way she had been treated by defendant. There was something said by witness, in his examination on the former trial, to the effect that if Milton would give up the boy to be whipped, he should not have prosecuted him; thinks he said, on his former examination, that the proposition to take $200, was repeated; thinks he also stated, "Would you, Fulmer, take $200, not to prosecute this suit?" did not recollect positively. After the proposition for a compromise, was talked about, Fulmer said he would see his wife, and he and

witness both went into the house. Thinks he asked Fulmer to go out, and have a conversation with him about the compromise. Distance from Fulmer's to Eldorado, about eight miles.

*James Tiffin*, witness for defendant, testified, in substance, that, on one evening in January, 1851, he and E. H. Goodwin, stopped at Fulmer's, to warm, and staid about half an hour. Fulmer was from home. Mrs. Fulmer and child were there. He had lived within about three miles of Mrs. Fulmer, for some three or four years; knew her general character for chastity and virtue, and it was bad. He had heard many persons speak of her, and never heard but one say he believed her virtuous.

*Questions by defendant*—"1. Please state the conversation you had with Mrs. Fulmer, the evening you say you and Mr. Goodwin were there in January, 1851.

"2. Did Mrs. Fulmer say anything to you, that evening; and, if so, what was it?

"3. Did, or did not, Mrs. Fulmer insist that you should stay all night with her?

"4. Did she, or not, tell you she liked to hug up a man in her arms, and tangle legs with him of a cold night?

"5. Did she, or not, tell E. H. Goodwin, if he would go to a certain place, near by, that he could get to sleep with a girl that night?

"6. Did you, or not, see a negro woman, slave of one of the neighbors, sitting down at Fulmer's table, in 1851, shortly before the commencement of this suit, by the request of Mrs. Fulmer, and she sitting down at the table, waiting on her?

"7. Did you, or not, hear Mrs. Fulmer say her husband had treated her badly about other men, and that if he did not quit it, she would leave him, and marry another man, which she could do very quick?"

VII. To the asking of which questions, the attorney for the State objected, the court sustained the objection, and defendant excepted.

*Cross-examined*—Witness meant, by general reputation, what

every body says, and rumor. He had known Mrs. Fulmer ever since she came to the country, three or four years, before the commencement of this prosecution.

*E. H. Goodwin,* witness for defendant, testified that he had known Mrs. Fulmer some five or six years, beginning in 1849; had lived in four or five miles of her; could not say that he knew her general character for chastity and virtue. Did not know much about her any way—only knew her when he saw her. He was going on twenty-two years old.

*Jesse B. Bailey,* witness for defendant, testified that he knew Sophia Fulmer—had known her something over four years; was not very well acquainted with her; during that acquaintance, he lived from four to twenty miles from her. He was not in the county in the year 1849. Most of the year 1850, he lived in about four miles of her. Knew little about her in the year 1851. Had heard her spoken about very much, but did not know very much about her general character. Knew nothing personally, but only what folks told him, and they did not speak well of her. He knew her general reputation for chastity and virtue in 1850 and 1851, and it was not very good—people did not speak very well of her. He knew her general reputation for truth and veracity, and that it was bad. He came here in February, 1850, and went to O. F. Neill's, in April, and, in September, went to another place, about the same distance. She has been moving about a great deal, and so has he. He ought not to like Fulmer, if he did. He was not more than five or six miles from where she lived, in the year 1850 and 1851.

*Question by defendant*—"1. From what you know from said Sophia Fulmer's general character, for truth and veracity, would you believe her on oath, in a court of justice?"

VIII. Objected to by attorney for the State, ruled out by the court, and defendant excepted.

*James Smith,* witness for defendant, testified that he had known Mrs. Fulmer since the year 1849; part of the time he had lived with Fulmer, did not recollect the precise time—it was in 1849

or 1850, or about that time. He was tolerably well acquainted with her general character in the years 1849, 1850 and 1851. Had no learning, and did not know what general reputation meant.

*Questions by defendant*—"1. Do you know what the belief of a majority of the people, where she lived in 1849, 1850 and 1851, was in regard to the character of the said Sophia Fulmer; and what, if you know, was it in regard to her character for virtue and chastity?

"2. What is the opinion of a majority of the people where she lived in 1849, 1850 and 1851, in reference to her character; and what was it in reference to her character for chastity and virtue?

"3. Do you, or not, know that said Sophia Fulmer has had criminal connection with some other person than her husband, repeatedly during the year 1849, 1850 and 1851?

"4. Do you, or not, know that she is a base and lewd woman, and was such in 1849, 1850 and 1851?"

IX. To the asking of which questions, the State's attorney objected; objection sustained by the court; and defendant excepted.

*Michael Harrell*, witness for defendant, testified that he knew Sophia Fulmer, in 1849, 1850 and 1851; could not say he knew her general character; knew nothing himself, only what he heard from others.

*Question by defendant*—"Do you know what was the universal talk and belief of the people, in her neighborhood, where she lived in 1849, 1850 and 1851?

*Answer*—"Does not know that he heard every body say, but he heard a good many talking; does not recollect, but there was a right smart talk as to her character."

*Jacob Burns*, witness for defendant, testified that he knew Sophia Fulmer in 1849, 1850 and 1851; had known her about six years; did not know any thing about her character for truth and veracity.

*Question by defendant*—"Do you know the general rumor and belief of the people, about Sophia Fulmer, where she lives?"

X. Objected to by the attorney for the State, objection sustained by the court, and defendant excepted.

XI. "Whereupon, the court said it would arrest the further examination of said witness, and did so," to which the defendant excepted.

*Robert H. Smith*, witness for defendant, testified that he was acquainted with the general character of Sophia Fulmer, in the years 1849, 1850 and 1851, and that her character was very bad; he never heard any one say it was good. Her general character for chastity and virtue, was bad from rumor, and from all the information he could gather. He knew her general character for truth and veracity, and it was bad; so far as he ever heard, she was regarded as unreliable, and her character was bad, so far as he knew.

*Questions by defendant*—"1. Would you believe her on oath, in a court of justice?

"2. Do you believe she is entitled to credit or belief in a court of justice?"

XII. Objected to by State's attorney, objection sustained by the court, and defendant excepted.

The bill of exceptions next states as follows:

XIII. "The defendant, by his attorney, then offered to introduce James Milton, the owner of said defendant, as a witness in his defence in this cause; and, to the introduction of said Milton, the State, by her attorney, objected: the court sustained the objection; and to the decision and ruling of said court, in sustaining said objection to the introduction of the said Milton, defendant, at the time, excepted."

Here the defendant closed his testimony.

XIV. The State recalled *Wm. Landers*, and offered to prove, by him, the appearance of Mrs. Fulmer, at the time she came to the mill after the alleged assault upon her, to which defendant objected, the court overruled the objection, and defendant excepted.

Whereupon, Landers testified that when Mrs. Fulmer came to

the mill, her dress was torn down in front, and she was crying; no marks or bruises were seen upon her by witness.

Both parties having here closed their testimony, the State's attorney moved to instruct the jury as follows:

"1st. That, if they believe, from the testimony, that the prisoner, Pleasant, assaulted Sophia Fulmer, with an intent feloniously to ravish and carnally to know her, forcibly and against her will, and that the said Sophia Fulmer is a white woman, they must find the defendant guilty.

"2d. That, should the jury believe, from the testimony, that Sophia Fulmer, the person alleged to have been assaulted, is a white woman, and has been, and was at the time of said alleged assault, of easy virtue, and that other white men, than her husband, had had illicit intercourse with her, such facts are no justification to the prisoner, and that, if they believe the prisoner did assault her with an intent feloniously to ravish her, and carnally to know her forcibly, and against her will, they must find defendant guilty.

"3d. That, should the jury believe, from the testimony, that the reputation of Sophia Fulmer, the prosecutrix, for truth and veracity, in the neighborhood where she lived, is bad, nevertheless if they believe, from her manner of testifying, from the other testimony in the cause, and from corroborating circumstances deposed to by witnesses, that her testimony is true, they must find defendant guilty."

XV. Which instructions the court gave, against the objection of defendant, and he excepted.

The defendant moved the following instructions:

"1. If the jury believe, from the evidence, that there was an agreement, between said Sophia Fulmer and Landers, to extort money from Milton, the owner of the negro, and this prosecution was set on foot for that purpose, they will find the defendant not guilty.

"2d. If they believe, from the testimony, there was a compromise made in this cause by said Sophia Fulmer, and Landers,

for the small sum of one hundred and twenty-five dollars, it detracts from their credibility.

"3d. If they believe, from the evidence, that said Sophia Fulmer has sworn falsely in this cause, they will find the defendant not guilty.

"4th. If they believe, from the evidence, that two unimpeached witnesses have contradicted said Sophia Fulmer, in her testimony given in this cause, they are authorized to disregard her evidence.

"5. If the jury believe that the said Sophia Fulmer has made mis-statements in a very small trivial matter, knowingly, in her testimony, in this cause, they are authorized to reject her testimony.

"6. The jury should scrutinize the testimony of the prosecutrix closely; and, if not sufficiently corroborated by other evidence, and is contradictory in itself, they may find the defendant not guilty.

"7. If they believe, from the evidence, that Sophia Fulmer's reputation for chastity and virtue is bad, it detracts from and lessens her credibility.

"8. If they believe, from the evidence, that the character of Sophia Fulmer, for truth and veracity, is bad, she is entitled to less credit: and if they believe her statements untrue, they should find defendant not guilty.

"9. That they are the judges of the sufficiency of the evidence.

"10. If the jury entertain a reasonable doubt of defendant's guilt, they should acquit."

XVI. All of which instructions, the court gave but the fifth and sixth, and defendant excepted to the refusal of the court to give them.

XVII. The motion for a new trial, was upon the following grounds:

1. The court permitted improper evidence to be given to the jury by the State.

2. Ruled out proper testimony for the defendant.

81BB

. 3. The court erred in not permitting defendant to ask proper and legal questions of divers witnesses.

. ' 4.. In giving the instructions asked by the State, and in refusing to give the fifth and sixth instructions, moved by the defendant.

5. In arresting the examination of the witness Burns.

6. In not permitting defendant to introduce and examine,. as, a witness, James Milton, the owner of the defendant.

7. In divers other decisions made in said cause.

8. The verdict of the jury is contrary to the evidence, to the law, and the instructions of the court.

9. The court permitted Landers to testify, both in chief and upon re-examination.

10.. The court erred in overruling defendant's motion to dismiss the case.

XVIII. The motion in arrest of judgment, was upon the following grounds :

1. There is no indictment in this court in the cause, and defendant was put upon his trial upon what purports to be a copy.

2. The court had no jurisdiction in this cause, there being no sufficient order of the Union Circuit Court showing a change of venue to this court, &c.

The motions for new trial and arrest being overruled, defendant was sentenced to be hanged on the 9th November, 1854; he appealed to this court, and the circuit judge having refused to suspend the sentence, it was done by order of one of the judges of this court in vacation.

A full statement of all the material facts appearing of record, has thus been made, in order that the points presented for the decision of this court, may be clearly understood.

I and XVIII. The motion to dismiss, and the motion in arrest of judgment, involving the regularity of the change of venue, may be considered together. It is urged, in both motions, that the order for the change of venue, was not sufficient to transfer the jurisdiction of the cause from the Union to the Ouachita Circuit

Court. The objection to the sufficiency of the order, is general, pointing out no particular defect. The application for the change of venue was made under the provisions of *secs.* 131, 132, *chap.* 52, *Digest*, and the order substantially conforms to *secs.* 133, 134, *and* 138, of the same chapter. See *State vs. Hicklin*, 5 *Ark. R.* 190; *Brown vs. State*, 13 *Ark. Rep.* 96. The additional objection in arrest of judgment that defendant was tried upon a copy of the indictment, is of no force. On a change of venue, the original indictment remains in the court where it is preferred, and a transcript of the record and proceedings in the cause, including the indictment, &c., is sent to the court to which the cause is removed, as was done in this case. See *sec.* 140, *chap.* 52, *Digest*.

II. The second exception is, that the court permitted Mrs. Fulmer to testify that she was a white woman. The allegation in the indictment, that she was a white woman, was material, and had to be proven by the State; and this court said, when the case was here before, that her own statement, to that effect, or that of any witness who knew her, though matter of opinion founded on her appearance, might be sufficient. *Pleasant vs. The State*, 13 *Ark.* 376. No reason is stated, and none can be conjectured, why she was not competent to testify as to that fact. It is to be presumed that she knew her parentage and race, as persons generally do, with that moral certainty required to prove such matters in legal proceedings; and, if any doubt existed as to the accuracy of her knowledge, or the truth of her statement, it was subject to contradiction by other witnesses, as well as any other statement made by her. See 1 *Greenlf. Ev.*, *sec.* 103, 104, 105

III. The third exception presents a question of some importance. On the cross-examination of Mrs. Fulmer, the counsel of the prisoner proposed to ask her thirteen questions, which, upon the objection of the attorney for the State, the court ruled out. Some of these questions, were designed to draw from her directly a confession or denial that she had been guilty of illicit intercourse with other persons than her husband, before the alleged

assault upon her by the prisoner: and others of these questions were intended to put her upon a confession or disavowal of specific improprieties, tending to the same point.

Our statute declares that if any negro or mulatto shall commit, or attempt to commit, rape upon a white woman, he shall, on conviction, suffer death. *Digest, chap.* 51, *part* 4, *art.* 4, *sec.* 9.

This statute embraces every class and condition of white females, and, regardless of their character or position in society, protects them from brutal assaults by negroes and mulattoes. When the offence is proven, the character of the female, however abandoned, furnishes no justification for the act.

But, in ascertaining the guilt or innocence of the accused, the same rules of evidence are to be observed, as govern in the trial of white persons, charged with like offences. *Digest, chap.* 51, *part* 10, *sec.* 6.

By the rules of the common law, it is well settled that, in trials for rape, or assaults with intent to commit rape, the character of the prosecutrix, or injured female, for chastity, may be impeached, not for the purpose of furnishing a justification or excuse for the offence, but for the purpose of raising the presumption that she yielded her assent, and was not forced in point of fact; and this presumption would doubtless be stronger or weaker, according to the degree of prostitution or degradation established by the impeaching evidence.

But, surely it may not be unsafe, or unjust to the prisoner, to say, that, in this State, where sexual intercourse between white women and negroes, is generally regarded with the utmost abhorrence, the presumption that a white woman yielded herself to the embraces of a negro, without force, arising from a want of chastity in her, would not be great, unless she had sunk to the lowest degree of prostitution.

But, returning to the question more directly under consideration, how is the chastity of the prosecutrix to be impeached?

*Rex vs. Hodgson,* 1 *Russell & Ryan* (*British Crown cases*) 211, is a leading case on this subject. Hodgson was tried for rape,

before Mr. Baron Wood, at the Summer Assizes, in the year 1811. After the prosecutrix had given her evidence in favor of the prosecution, the counsel for the prisoner, on cross-examination, put these questions to her: " *Whether she had not before had connection with other persons? and whether she had not before had connection with a particular person named?*"

The counsel for the prosecution objected that she was not obliged to answer these questions, but it was contended by the prisoner's counsel that, in a case of rape, she was.

The learned judge allowed the objection, on the ground that the witness was not bound to answer these questions, as they tended to criminate and disgrace herself, and said that he thought there was not any exception to the rule in the case of rape.

The prisoner's counsel then offered a witness to prove *that the prosecutrix had been caught in bed, about a year before this charge,. with a young man*, and offered the young man to prove he had connection with her.

The counsel for the prosecution objected to the admissibility of this sort of evidence of *particular facts*, not connected with the present charge, as they could not come prepared to answer them.

The judge allowed the objection, and the witnesses were not examined.

The prisoner was convicted, but the judgment was respited, and these points saved for the consideration of the judges.

In December, 1811, the case was considered in the King's Bench, by all the judges except four, who were absent; and was postponed for consideration to Hilary Term, in January, 1812, when all the twelve judges being present, they determined that both the objections were properly allowed

In *Rex vs. Clarke*, 2 *Stark. Rep.* 241, (3 *Eng. Com. L. Rep.* 393), HOLROYD, J., held that, in an indictment for rape, or an assault with intent to commit rape, the chastity of the prosecutrix might be impeached by general evidence, but that the prisoner could not go into evidence of particular facts.

In *Rex vs. Martin*, 6 *Carr. & Payne* 562, (25 *Eng. C. L. R.*

575), WILLIAMS, J., held that, on the trial of an indictment for rape, the prosecutrix might be asked, whether, previously to the commission of the alleged offence, the prisoner had not had intercourse with her by her consent. The judge also said, that he was of counsel in the case of *Rex vs. Hodgson*, and seemed to doubt the correctness of the doctrine of that case.

In *Barker's case*, 3 *Carr. & Payne* 588, (14 *Eng. C. L. R.* 730), PARK J., after consulting Mr. Justice JAMES PARKE, on a trial for rape, allowed the prisoner's counsel to ask the prosecutrix, with a view to contradict her, whether, since the alleged offence, she had not walked in the town of Oxford, on High street, to look out for men, and whether she had not walked in High street, with a woman reputed to be a common prostitute, Mr. Justice PARK said he had great doubt, whether, since the case of *Rex vs. Hodgson*, he could permit the prisoner to prove particular acts of criminality in the prosecutrix, though he might certainly give evidence of general lightness of character, and general evidence of her being a street walker.

In *Rex vs. Robins*, 2 *Moody & Robinson* 512, the prosecutrix having, on cross-examination, denied that she had had connection with other men than the prisoner, COLERIDGE, J., after consulting with ERSKINE, J., held that those men might be called to contradict her. It does not appear, from the report of this case, that any objection was made to the prosecutrix being asked whether she had had connection with other men.

Though it seems individual judges, sitting in the inferior courts of England, have expressed doubts as to the correctness of the decision of the twelve judges in *Rex vs. Hodgson*, yet, such doubts are not to be regarded as overturning that case.

Upon trials for rape, or assaults with intent to commit rape, says Mr. PHILLIPS, evidence is admissible, on the part of the prisoner, that the woman bore a notoriously bad character, for want of chastity and common decency; also that she had been before criminally connected with the prisoner. 1 *Phill. Ev.* 468. But she is not obliged to answer, whether, on some former occasion.

she had not a criminal connection with other men, or with particular individuals; nor is evidence of such criminal intercourse admissible. 2 *Phil. Ev.* 419. To the same effect, see 2 *Starkie Ev.* 951-2; *Roscoe's Ev.* 96; *Wharton's American Crim. Law* 440; 1 *Greenl. Ev.*, sec. 458; 5 *Kinnie's L. Comp.* 202; *Camp vs. The State*, 3 *Kelly's Rep.* (*Geo.*) 417.

In *The State vs. Jefferson*, 6 *Iredell's Rep.* 305, a slave was indicted for a rape upon a white woman. The woman was a witness, and proved the offence. The prisoner admitted his connection with her, but alleged that it was by her consent, and that there had been a previous criminal intimacy between them. After an answer in the negative, to a question put to the woman, on her cross-examination, whether she had not allowed the prisoner to put his hands on her, in a free and familiar manner, it was proven by another slave, on the part of the prisoner, that he had frequently seen the prisoner treat her in that manner.

The prisoner offered further to prove, that the woman had permitted other negro men to kiss her, and take other liberties with her; but, upon objection of the State's attorney, the court rejected this evidence. On appeal to the Supreme Court of North Carolina, the decision of the judge on this point, was sustained. The court, by the Chief Justice, said: "That familiarities had occurred, indicative of habitual criminal connection between the prosecutrix and the prisoner, as proved by the prisoner's fellow servant, was properly left to the jury, as tending to disprove the probability of the use of force or fear by the prisoner, and to discredit the witness for the State. No doubt, too, that it would have been proper to receive evidence that the woman was a strumpet, upon similar grounds; and particularly that she had intercourse with other negroes; *but that ought only to be done upon general evidence:* for, it is a question of character, and, as in other cases where that question arises, it would be a complete surprise, if *particular instances of such familiarity*, with a certain person, or with certain persons, were received as evidence to establish the character. The point, indeed, is not new, but was ruled

in *Hodgson's case, Russ. & Ry.* 211, and *Rex vs. Clarke,* 2 *Stark. R.* 241."

We have looked into this question with much care, because of the decision of the Supreme Court of New York, in the case of *The People vs. Abbot,* 19 *Wend. R.* 192, relied on by the counsel of the appellant, where it was held that, on a trial for rape, or assault with intent to commit rape, the prosecutrix might be asked whether she had not had previous connection with other men; and that she was not privileged from answering.

Our conclusion is that the weight of authorities is against this case, on this point. Such an examination of the prosecutrix, is inquisitorial, and tends to compel her to criminate and disgrace herself, or to commit perjury. The subject may be concluded by quoting and adopting the rule as stated by Mr. GREENLEAF, in the 3d *vol. of his work on Evidence,* 2 *Ed., sec.* 214, *p.* 195. He says: "The character of the prosecutrix, for chastity, may be impeached; but this must be done by general evidence of her reputation in that respect, and not by evidence of particular instances of unchastity. Nor can she be interrogated as to a criminal connection with any other person, except as to her previous intercourse with the prisoner himself; nor is such evidence of other instances, admissible."

But it seems that though the prosecutrix is not bound to answer such questions, as to her connection with other men, yet this is but a privilege allowed her, which, on being properly advised by the court of her privilege, she may waive, if she think proper. 1 *Greenl. Ev. sec.* 460; 2 *Phill. Ev.* 425, 427; *Southard vs. Rexford,* 6 *Cowen R.* 254, *and cases cited.*

The 11th question, which the counsel for the prisoner proposed to put to Mrs. Fulmer, it may be remarked, is not of a class with the others, having reference to the indebtedness of her husband to Landers, and which the court below perhaps ruled out for irrelevancy.

IV. It was competent for Landers to state, on his examination in chief, the appearance of Mrs. Fulmer, when she came to the

mill, and that she complained that an assault had been made upon her; but the court erred in permitting him then to state the particular facts which she related to him. But the particulars of her statement might have been brought out, by way of confirming her testimony, after the attempt made by the prisoner to impeach her credit. 3 *Greenlf. Ev.*, sec. 213; *Rex vs. Clarke*, 2 *Stark. Rep.* 241; *Roscoe Cr. Ev.* 863; *Whart. Am. Cr. Law* 441; 2 *Starkie Ev.* 951; *Stephen vs. State*, 11 *Georgia Rep.* 225; *The People vs. McGee*, 1 *Denio* 19; *Regina vs. Megson*, 9 *Carr. & Payne* 420.

V. The fifth exception, was to the decision of the court ruling out, on the objection of the State, five questions put to the witness Landers, on his cross-examination, by the prisoner's counsel. The object which the counsel had in view, in asking these questions, is not stated in the bill of exceptions, but is left to inference. It is the province of the judge, at the trial, to confine the examination of the witnesses to matters relevant to the issue, and to exercise a sound discretion in excluding irrelevant and foreign matters. Where the counsel puts a question to a witness, which does not, in its terms, manifest a relevancy to, or bearing upon the issue, it would be the duty of the counsel, in fairness to the court, to state its object, in order that the judge might not be put upon the hazzard of committing an error, by admitting or excluding it. The object of the five questions, which the prisoner's counsel proposed to ask Landers, was, perhaps, to draw from him an admission or denial, that Fulmer was indebted to him, had not the means to pay, and that he, Landers, combined with Fulmer and his wife, to obtain money from Milton, the owner of the slave, by compounding the prosecution : in other words, to implicate Landers in the compounding of a felony, and thereby to discredit him. See *Digest, chap.* 51, *part* 7, *art.* 3, *sec.* 6. If this was the object, though the questions might be put, the witness was privileged from answering. *Pleasant vs. The State*, 13 *Ark.* 378. Had Landers been an accomplice of the negro in the alleged assault upon Mrs. Fulmer, he, not being indicted, could

82BB

have been compelled to testify on the trial of the negro, and his testimony could not have been used against him afterwards. See *State vs. Quarles*, 13 *Ark.* 307. But, if he chose to disclose his connection with another and distinct offence, he would not be protected; and, therefore, could not be compelled to do it. *Whart. Am. Cr. Law* 307.

VI. It seems that, on the trial, the witnesses were put under the rule, and afterwards, Landers was seen conversing with Fulmer, who had been with his wife after she was examined; and, for this cause, the prisoner moved to exclude him from testifying, but the court, after ascertaing from Landers what conversation had passed between him and Fulmer, permitted him to testify. The presumption is, the contrary not appearing from the bill of exceptions, that the court ascertained, from Landers, that no conversation had occurred between him and Fulmer, prejudicial to the prisoner. But, if this were not so—even if Landers had remained in, or returned to, the court-house, after he was put under the rule, and heard Mrs. Fulmer testify, this would not have been absolute cause to exclude him, but the court had the discretion to permit him to be examined, and his conduct would have gone to his credit. The power of the court to exclude a witness for disobedience of the rule, is rarely exercised in this country, but the witness is punishable for contempt. 1 *Greenlf. Ev.*, sec. 432; *State vs. Brookshire*, 2 *Ala. Rep.* 305; *Keith vs. Wilson*, 6 *Mo. Rep.* 435; *Dyer vs. Morris*, 4 *Ib.* 214. See, also, *Roscoe Crim. Ev.* 162; 1 *Starkie Ev.* 189; 2 *Phillips Ev.* 395.

VII. The 3d, 4th, 5th, 6th, and 7th questions, put by the prisoner's counsel to his own witness, James Tiffin, were leading, according to the rule as held in *Clark, adx. vs. Moss et al.*, 6 *Eng. Rep.* 741, and were objectionable on that ground. All of the questions were designed to prove upon Mrs. Fulmer particular improprieties, tending to impeach her chastity, which, we have determined above, is to be done by general evidence.

VIII. The *eighth* exception, as well as several others of the same class, presents for consideration the proper mode of impeach-

ing the character of a witness for truth and veracity. On this subject, *Greenleaf* (1 *Ev.*, sec. 461,) says: "The regular mode of examining into the general reputation, is to inquire of the witness whether he knows the general reputation of the prisoner in question among his neighbors; and what that reputation is. In the English courts, the course is further to inquire whether, from such knowledge, the witness would believe such person on his oath. In the American courts, the same course has been pursued; but its propriety has, of late, been questioned, and perhaps the weight of authority is now against permitting the witness to testify as to his own opinion. The inquiry must be made as to the general reputation of the witness where he is best known. It is not enough that the impeaching witness professes merely to state what he has *heard* "others" say, for those "others" may be but few. He must be able to state what is *generally said* of the person, by those among whom he dwells, or with whom he is chiefly conversant; for it is this only that constitutes his general reputation or character. And, ordinarily, the witness ought himself to come from the neighborhood of the person, whose character is in question."

In support of the remark, that the weight of authority in America is now against permitting the witness to testify as to his own opinion, Mr. Greenleaf cites *Gass vs. Stinson*, 2 *Sumner Rep.* 610; *Kimmel vs. Kimmel*, 3 *Serg. & R.* 336, 338; *Wike vs. Lightner*, 11 *Ib.* 198; *Swift's Ev.* 143; *Phillips vs. Kingfield*, 1 *Appleton's Rep.* 375.

These authorities are entitled to great respect; but, in this State, the practice has prevailed to permit the witness to give his own opinion as to the credibility of the person impeached, founded on general reputation, after showing that he has the requisite knowledge of such reputation, and we are not disposed to disturb this practice.

The usual mode of putting the question, is:

"Do you know the general reputation of the witness, for truth and veracity, among his neighbors?" If answered in the affirma-

tive, the inquiry may be made, what it is, whether good or bad.
Then the witness may be asked:

"From your knowlekge of his reputation, for truth and veracity,
among his neighbors, would you believe him on oath?" See the
authorities above cited; also, *Whart. Am. Cr. Law* 312; 1 *Stark.
Ev.*, 7 *Am. Ed.* 211, 212, *and note* (1); 2 *Phil. Ev.* 432.

In cases of rape, or assaults with intent to commit rape, the in-
quiry as to the reputation of the prosecutrix, is not confined to
truth and veracity, but extends, as we have seen, to her chastity.
Whether this is the only exception to the rule, we do not mean
to decide in this case, as the question does not arise. There are
some authorities against confining the inquiry, in any case, to the
reputation of the witness for *truth* and *veracity*, and in favor of
extending it to the entire moral character and standing in society.
*Sec.* 1, *Greenlf. Ev.*, note 3 to sec. 461, *p.* 582.

The question put by the counsel of the prisoner, to the witness,
Jesse B. Bailey, and ruled out by the court, was not in the usual
form; nor does it appear to have been preceded by the prelimi-
nary question as to the knowledge of the witness of the reputa-
tion of Mrs. Fulmer, for truth and veracity among her neighbors.
True, he made a statement as to what his knowledge, on that sub-
ject, was, but it is doubtful whether it was such as to entitle him
to express an opinion as to her credibility. Before he could ex-
press such opinion, however, he should have been required to
answer the preliminary question in the affirmative.

IX. The court should have permitted the witness, James Smith,
to answer the *first* and *second* questions put to him by the pris-
oner's counsel, as they referred to the *general character* of Mrs.
Fulmer, for *chastity*. The *third* question, was properly disallow-
ed by the court, because it referred to a criminal connection be-
tween her and some particular person. The *fourth* was put in a
leading form; and, on that account, was objectionable. Moreover,
this question: "Do *you*, or not, *know* that she is a bad and lewd
woman, and was such in 1849, 1850 and 1851?" is perhaps put
in a more restricted form than is warranted upon principle. The

witness is called upon to state that she is a lewd woman, upon his own knowledge, without any reference to her reputation in her community. That it may be proven that she is a *strumpet* or *prostitute*, is conceded; but if this may be done by a witness upon his personal knowledge of her, without regard to her general reputation, it places the character of the prosecutrix in the power of the witness, regardless of any appeal that she may be able to make to her good standing in the community. As well ask the witness, if he had had connection with her, as to ask him to state, upon his own knowledge, that she was a lewd woman. If a woman is a prostitute, it is soon "whispered to the winds," and generally known among her neighbors. Communities are ordinarily quick scented upon such subjects, and sometimes the reputation of the innocent is blasted upon false suspicions. With all due respect for the learning of Judge COWEN, we think he has gone further, in *The People vs. Abbot*, than the authorities warrant.

X. The question put by the prisoner's counsel to the witness, *Jacob Burns*, neither referred to her reputation for truth or chastity, but enquired for the "rumor and belief" of the people about Mrs. Fulmer generally, and, in that form, was properly disallowed by the court.

XI. For what reason the court arrested the further examination of this witness, does not appear; but the presumption is, that the court exercised a sound discretion in terminating his examination, in the absence of any showing in the bill of exceptions that the prisoner proposed to prove by him some further material fact in the cause, and was cut off by the dismissal of the witness from the stand.

XII. Both of the questions proposed on behalf of the prisoner, to the witness, *Robert H. Smith*, were properly ruled out by the court. They sought his opinion as to whether Mrs. Fulmer's oath was entitled to credit, without indicating to him, in the terms of the inquiries, that his opinion must be founded on his knowledge of her general reputation for truth and veracity among her neighbors.

XIII. The court excluded *James Milton*, the owner of the prisoner, from testifying in his behalf. On what grounds the judge refused to permit this witness to be introduced, is not stated in the bill of exceptions, but we may presume, in a case of this magnitude, involving the life of a human being, that the judge supposed the owner of the slave to be incompetent, by reason of his interest in the result of the prosecution. In this, the court erred. This court has decided, upon high authority, and on grounds of public policy and humanity, that the master is a competent witness for his slave, and that his interest goes to his credibility. *Austin vs. The State*, 14 *Ark. R.* 555.

XIV. The court did not err in permitting the State to re-call the witness Landers, to prove the appearance of Mrs. Fulmer, when she came to the mill, immediately after the alleged assault upon her by the prisoner. This might have been proven on the examination in chief, but it was competent as rebutting testimony, after the attempt to impeach the prosecutrix.

XV. The *first* and *second* instructions given to the jury, on the part of the State, are substantially as given on the previous trial, and approved by this court when the case was here before. No valid objection is perceived to the *third* instruction for the State. Mrs. Fulmer proved, substantially, every material allegation contained in the indictment; her credibility was the only matter left for the jury to determine, and the third instruction was intended to advise them of the legal tests by which they were to be governed in coming to a conclusion as to the credit to be given to her evidence. It is true that the court did not tell the jury, in either of these instructions, that, in order to convict the defendant, they must find, from the testimony, that he was a negro, that the offence was committed in Union county, and on a day previous to the finding of the indictment; but all these facts were proven, and there could have been no controversy about them. The object of the charge of the court is, to settle the law upon controverted points. In the *first* instruction, asked by the prisoner, and given by the court, it was assumed that he was a *negro*.

XVI. Taking all the instructions given by the court to the jury, they appear to have been favorable enough to the prisoner; and those given at his instance, were sufficient to guide the jury in coming to a conclusion as to the credibility of the principal witness for the State, and the weight to be attached to her testimony, without the *fifth* and *sixth*, which the court declined to give, and which were expressed in terms stronger, perhaps, than was warranted by law.

XVII. All the grounds urged in the motion for a new trial, have been considered, except the one that the verdict was contrary to the evidence. If this were the only ground, the verdict of the jury, whose province it was to pass upon the weight of the testimony, would not be disturbed. According to the statement of Mrs. Fulmer, corroborated, to some extent, by the testimony of Landers, the prisoner insolently intruded upon an unprotected woman, at her own house, engaged in her domestic duties, and committed an assault upon her, brutal in its nature, and abhorrent to humanity. If the jury believed her testimony, they could not have done otherwise than find the prisoner guilty.

But, for the errors committed by the court, as indicated above, the judgment must be reversed, and the cause remanded, with instructions to grant the prisoner a new trial, &c.